UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WILLIE L. HARDY,

        Petitioner,

                                   CASE NO. 2:07-CV-11109
  v.                        JUDGE STEPHEN J. MURPHY, III
                                   MAGISTRATE JUDGE PAUL J. KOMIVES

KENNETH ROMANOWSKI,

        Respondent.

_____/

**REPORT AND RECOMMENDATION**

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
             C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    D.    *Fourth Amendment (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    E.    *Right to Present a Defense (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
             1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
             2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    F.    *Sufficiency of the Evidence (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
             1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
             2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    G.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

\*       \*       \*       \*       \*

I.     **RECOMMENDATION:** The Court should deny petitioner's application for the writ of habeas corpus.

II.    **REPORT**:

A.    *Procedural History*

       1.    Petitioner Willie L. Hardy is a state prisoner, currently confined at the Gus Harrison Correctional Facility in Adrian, Michigan.

2.      On October 22, 2003, petitioner was convicted of possession with intent to deliver between 50 and 449 grams of cocaine, MICH. COMP. LAWS § 333.7401(2)(a)(iii); two counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b; possession of marijuana, second offense, MICH. COMP. LAWS §§ 333.7403(2)(d), .7413(2); felon in possession of a firearm, MICH. COMP. LAWS § 750.224f ; and assaulting, resisting, and obstructing a police officer, MICH. COMP. LAWS § 750.81d(1), following a jury trial in the Oakland County Circuit Court. On November 12, 2004, he was sentenced to terms of 8-20 years' imprisonment on the cocaine conviction, 2-15 years' imprisonment on the felon in possession and resisting convictions, and to mandatory consecutive terms of two years' imprisonment on the felony-firearm convictions.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      DEFENDANT WAS DENIED THE PROTECTION OF THE FOURTH AMENDMENT WHERE POLICE EXCEEDED THE LIMITED SCOPE OF THE PROTECTIVE SWEEP OF APPELLANT'S RESIDENCE.

II.     APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT EVIDENCE IN SUPPORT OF HIS DEFENSE.

III.    THE EVIDENCE PRESENTED AT APPELLANT'S TRIAL WAS INSUFFICIENT TO CONVICT HIM OF THE POSSESSION OFFENSE.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Hardy*, No. 259971, 2006 WL 1330223 (Mich. Ct. App. May 16, 2006) (per curiam).

4.      Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Hardy*, 477 Mich. 869, 721 N.W.2d 226 (2006).

5.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

2

on March 15, 2007.  As grounds for the writ of habeas corpus, he raises the three claims that he raised

in the state courts.[1]

      6.       Respondent filed his answer on May 25, 2007.  He contends that petitioner's Fourth

Amendment claim is without merit and that petitioner's remaining claims are without merit.

B.     *Factual Background Underlying Petitioner's Conviction*

      The evidence underlying petitioner's convictions was accurately summarized in the

prosecutor's brief to the Michigan Court of Appeals:

> Prior to trial, an evidentiary hearing was held on August 19, 2004, pursuant to the Defendant's motion to suppress evidence.  The People called Mr. David Downs as their first witness.  Mr. Downs testified that he was the manager of the Fox Pointe Apartments in the City of Pontiac.  In the morning hours of October 22, 2003, Mr. Downs observed Lakesha Leonard, a resident of Apartment D-117, running toward the front door of his apartment.  As Mr. Downs prepared to buzz her into his building, the Defendant Willie Hardy ran up behind Ms. Leonard, grabbed her by the shoulder and pulled her back toward their apartment, D-117.  (T of 8/19/04, hereafter EH, 3-4).  Ms. Leonard was yelling "Let me go."  (EH, 7).  Mr. Downs called 911 for the police because he feared for the safety of Ms. Leonard and her infant child.  When two police officers arrived, Mr. Downs told them what he had seen and gave them a pass key for the outer door of Building D.  (EH, 7).  The Defendant and Ms. Leonard had signed the lease for Apartment D-117.  (EH, 5).
>
> Officer Casey Crampton of the Pontiac Police Department testified that he had been a police officer for 7 years and had responded to several hundred calls concerning domestic situations.  On October 22, 2003, Officer Crampton and his partner Officer Donald Russell were dispatched to an apartment at 900 Martin Luther King Blvd. in Pontiac.  Officer Crampton was in his police uniform.  The information given to the officers was that Defendant Willie Hardy was assaulting a female.  Upon arriving at the apartment complex, the officers spoke with the manager David Downs and obtained a pass key from him for Building D.  (EH, 13-14).  The officers entered the outer door of Building D and could hear a male voice yelling and screaming.  They proceeded to Apartment D-117.  The door to that apartment was open about a foot and had been damaged.  (EH, 14-15).  The officers could hear a male voice yelling and could also hear a female voice.  The officers had run the Defendant's name on LEIN while driving to the apartment complex and learned that there was an outstanding warrant for the Defendant's arrest for domestic violence.  (EH, 16).  The officers

---

[1]Petitioner did not file a separate brief in support of his habeas application.  I therefore rely on the brief filed in the Michigan Court of Appeals to analyze petitioner's claims.

entered Apartment D-117 to arrest the Defendant on that warrant and also to investigate the assault described by David Downs.  The officers feared for the safety of Ms. Leonard.  (EH, 16).

Officer Crampton testified that once in the apartment, he observed the Defendant yelling.  Another male was on a couch and Ms. Leonard was in the kitchen area holding a baby.  Officer Crampton managed to arrest the Defendant for the outstanding warrant after a struggle with him.  (EH, 17).  While struggling with the Defendant, Officer Crampton observed his partner Officer Russell draw his firearm. Officer Crampton pushed off the Defendant and observed two other males coming at him from down the hallway within the apartment. The officers ordered all the males to lay on the floor and handcuffed three of them with the three pairs of handcuffs which they had with them.  Officer Russell stayed with the uncuffed male and Ms. Leonard while Officer Crampton proceeded to check the rest of the apartment for other people for the safety of the officers.  (EH, 18-19).  Officer Townsend entered a bedroom and saw the barrel of a rifle sticking out from under the bed.  He secured the rifle by unloading it.  He also checked a closet in the bedroom.  (EH, 19-20).  Before entering the bathroom, Officer Crampton observed a black hard shell case in a closet near the bathroom.  He thought it might be a gun case and opened it.  There were tools inside.  Officer Crampton also checked a partially open shoe box next to the black case and observed marijuana in the box.  (EH, 21-33).  He also observed a large knife on the shelf above the shoe box.  (EH, 22).  After checking the bathroom, Officer Crampton contacted his supervisor and received instructions to secure the scene while waiting for other officers.  (EH, 22).

The defendant called Officer Donald Russell of the Pontiac Police Department as a witness.  Officer Russell testified that he and his partner Officer Crampton were dispatched to the Fox Pointe Apartments on a possible domestic violence situation. (EH, 37).  The manager told the officers the specifics as to what he had seen and heard.  That information was consistent with a domestic violence situation.  (EH, 49). The manager said that he had seen a screaming woman being dragged by her hair. (EH, 52).  After receiving a pass key from the manager, the officers proceeded toward Apartment D-117.  As they went up the stairs to get to that apartment, they heard loud yelling.  Officer Crampton had said that if the Defendant Hardy was present that he was going to arrest him on a domestic violence warrant.  (EH, 37-39).  The yelling and the fact that the door was ajar suggested to Officer Russell that something was wrong. (EH, 40).  The officers decided to enter the apartment because they felt that someone's life might be in danger.  (EH, 51).  The officers proceeded into the apartment and Officer Russell observed the Defendant and another man in the living room and also saw a lady with a baby.  (EH, 41-43).  As the officers attempted to arrest the Defendant, two other men were coming towards them from the back of the apartment. Officer Russell drew his gun and told everyone to get on the floor.  After the people were on the floor in the living room, Officer Crampton did a visual search of the apartment for other people or objects that could harm the officers.  (EH, 44-45).  After Officer Crampton went through the apartment, he called a supervisor for a search warrant.  (EH, 46-47).  Officer Russell secured the scene until other officers arrived with a search warrant.  (EH, 47).

After arguments by defendant's counsel and the assistant prosecutor, the trial court denied the Defendant's motion to suppress the evidence found in the apartment. . . .

The Defendant's jury trial commenced on October 18, 2004, with Judge Tyner presiding. The People called Mr. David Downs as their first witness. Mr. Downs testified that he was the manager of the Fox Pointe Apartments in Pontiac. Mr. Downs leased Apartment D-117 to the Defendant Willie Hardy. (T of 10/18/04, hereafter T-I, 82-83). On October 22, 2003, at approximately 10:30 A.M., Mr. Downs saw the Defendant come across the courtyard towards Mr. Downs' office. A woman had just pushed the buzzer requesting to get into Mr. Downs' office. Mr. Downs knew the woman as someone who was in and out of the Defendant's apartment. The Defendant grabbed the woman and pulled her back against her will towards the Defendant's apartment building. (T-I, 83-84). Mr. Downs called 911. When the police arrived, he gave them a pass key for the common door to Building D. (T-I, 84-85). Before the officers arrived, Mr. Downs could hear yelling and screaming coming from Building D. Mr. Downs knew that the woman grabbed by the Defendant had recently had a baby. Mr. Downs was concerned about the safety of the woman and the baby and conveyed that concern to the officers. (T-I, 87-88). Mr. Downs eventually saw the officers escort four people out of Building D in handcuffs. (T-I, 85-86). Mr. Downs identified a lease for Apartment D-117 signed by the Defendant and Lakesha Leonard. (T-I, 86-87). Mr. Downs knew that both Lakesha Leonard and Carnesha Leonard were in and out of Apartment D-117, but wasn't sure which woman was which. (T-I, 88).

Officer Casey Crampton of the Pontiac Police Department testified that on October 22, 2003, he was working on road patrol in uniform with his partner Officer Russell. The officers were dispatched to the Fox Pointe Apartments. The officers arrived at the apartments and spoke with Mr. Downs who told them what he had heard and seen. The officers ran the name of the Defendant on LEIN and learned that there was an outstanding warrant for his arrest. (T-I, 93-98). The officers proceeded to Apartment D-117. As they approached that apartment, they could hear screaming and yelling. They observed that the wooden door frame for Apartment D-117 was broken, pieces of it were laying in the hallway and the door was open about a foot. (T-I, 96). As the officers entered the apartment, Officer Crampton saw the Defendant standing in front of them about 10 feet away without a shirt. Ms. Leonard was to the right of the officers holding a baby. An unidentified black male was sitting on a couch. Officer Crampton told the Defendant that he was under arrest for a warrant and attempted to handcuff him. The Defendant began to struggle with Officer Crampton and kept pushing him away. (T-I, 97-98). Officer Crampton saw his partner Officer Russell draw his firearm and point down the hallway behind the Defendant. Officer Russell said get down in a loud voice. (T-I, 99).

Officer Crampton testified further that he drew his firearm and saw first one black male and then another black male coming down the hallway toward him and Officer Russell. After all the males were down on the floor, the officer eventually secured all of them. Officer Crampton first looked into the kitchen to see if there were any weapons that could be used to hurt his partner while he checked the remainder of the apartment. He did not lift anything up in the kitchen. (T-I, 127-129). Officer

Crampton then went down the hallway toward the back of the apartment to check for anybody else that might be in the apartment. (T-I, 99-100). He was looking for people or weapons that could hurt him and his partner. (T-I, 120; 125). He went into a bedroom and observed the barrel of a rifle sticking out 5 or 6 inches from underneath a bed. Officer Crampton secured the rifle. The rifle was cocked with a round in the chamber. The rifle picked up by Officer Crampton was admitted into evidence. (T-I, 100-103). Officer Crampton next started toward the bathroom to check for anyone in there. As he proceeded toward the bathroom, he observed in an open closet a hard black shell case partially open with a shiny metallic object inside it. Officer Crampton was concerned that it was a gun case with a gun inside it, so he opened the case. There were some tools in the case. (T-I, 103-104). Officer Crampton observed a partially opened shoe box next to the shiny case. There was a large knife and what appeared to be marijuana in the shoe box. The knife and marijuana seen by Officer Crampton in the shoe box were admitted into evidence. (T-I, 104-107). After the apartment was secured, Officer Crampton notified his sergeant what he had seen and the vice squad was called. Officer Crampton took the Defendant to the police station and did not assist in the search of the apartment. (T-I, 108).

Officer Donald Russell of the Pontiac Police Department testified that on October 22, 2003, he was on the road patrol duty in uniform. He was dispatched to the Fox Pointe Apartment as a back-up for Officer Crampton. After meeting with Mr. David Downs the officers proceeded to Apartment D-117. (T-I, 130-131). Officer Crampton had said earlier that if the Defendant Willie Hardy was present in the apartment that he was going to arrest him on an outstanding domestic violence warrant. The door for Apartment D-117 was ajar and the officers could hear a loud male voice screaming inside the apartment. (T-I, 132-133). The officers entered the apartment and Officer Crampton attempted to handcuff the Defendant, but the Defendant was struggling with him. A woman and infant child were to the right of the officers and a black male was to their left. (T-I, 133-134). Officer Russell saw first one and then two males jump out from a back bedroom and come down the hall towards the officers. Officer Russell sensed danger, pulled out his gun and ordered everybody down to the ground. All four males complied with his order and laid on the floor. (T-I, 134-136).

Officer Russell testified further that after three of the four males were handcuffed, Officer Crampton went towards the back bedroom to see if there were any people there. Officer Crampton informed him that there was a knife on a shelf where it could be grabbed by anyone and that there was a 30/30 Winchester Rifle, loaded with the hammer cocked in the bedroom. (T-I, 137-138). After Officer Crampton told Officer Russell what he had found, other officers were notified and arrived at the apartment. The four males were removed from the apartment and the infant was released to a relative. (T-I, 138-139). Sgt. Krupa eventually arrived with a search warrant and Officer Russell assisted in the search of the apartment. He opened a drawer on the right side of the sink and saw a sock that you could hide things in. He picked up the sock and could feel pieces of something hard inside it. He unrolled the sock and found a plastic bag containing a large quantity of what he believed to be crack cocaine. The sock and the crack cocaine were admitted into evidence. (T-I,

141-143).  In Officer Russell's experience, you could hardly ever get fingerprints from a wrinkled plastic baggie.  (T-I, 164).

Officer Douglas Strablow of the Pontiac Police Department testified that on October 22, 2003, he was assigned to the traffic safety unit and was dispatched to back up some officers at Apartment D-117 at 900 Martin Luther King Boulevard in the Fox Pointe Apartments.  He assisted in the search of [the] apartment pursuant to a search warrant.  In the bedroom in the rear of the apartment, he found correspondence addressed to the Defendant and to Ms. Lakesha Leonard at that address.  He did not find in the bedroom any correspondence addressed to anyone else.  (T of Morning Session of 10/21/04, hereafter T-II, 3-5).  Officer Strablow testified on cross-examination that he was the first officer to find the 56 grams of marijuana in the shoe box in the closet.  (T-II, 11).

Sergeant Matt Krupa of the Pontiac Police Department testified that he was in charge of the Narcotics Section of that department.  He had been a police officer for 10 years and in the Narcotics Section for 6 years.  (T-II, 13-14).  Sgt. Krupa detailed the extensive training and experience that he had in the field of narcotics trafficking and testified that he had previously been qualified as an expert witness in that field.  The trial court certified Sgt. Krupa as an expert witness in the field of narcotics trafficking without objection.  (T-II, 14-19).  Sgt. Krupa was one of the officers who procured a search warrant on October 22, 2003, for Apartment D-117 at 900 Martin Luther King Boulevard and searched that apartment pursuant to the search warrant.  (T-II, 19).  Sgt. Krupa watched Officer Russell pull out a large amount of crack cocaine from a sock in the kitchen.  (T-II, 20).  In a kitchen drawer to the left of the sink, Sgt. Krupa found a digital scale.  (T-II, 21).  Such a scale could be used to weigh amounts of crack cocaine for sale.  (T-II, 25).  Sgt. Krupa also found a box of sandwich baggies and some torn baggies.  The torn baggies were indicative of the manner in which rocks of crack cocaine are packaged for sale.  (T-II, 21; 23-24).  Sgt. Krupa found in a drawer correspondence and lease documents addressed to the Defendant and Carnesha Leonard at 900 Martin Luther King Boulevard, Apartment D-117.  (T-II, 22).  Sgt. Krupa gave his opinion that the retail value of the cocaine found in the Defendant's apartment was about $10,000.  (T-II, 26).  No pipes for smoking crack cocaine were found in the apartment.  The amount of cocaine found in the apartment was more than a user of cocaine would usually have.  (T-II, 26-27).  The woman present in the apartment at the time of the search was Carnesha Leonard, not Lakesha Leonard.  (T-II, 31).  Sgt. Krupa did not believe that either the baggies or the digital scale were ever examined for fingerprint evidence.  (T-II, 33-35).  Sgt. Krupa could not recall ever getting a fingerprint off of a plastic baggie.  (T-II, 43).

Officer Jacqueline Martindale of the Pontiac Police Department testified that she was a crime scene investigator and had been trained in fingerprint analysis.  (T-II, 54-57).  Officer Martindale examined baggies found in the Defendant's apartment and could not locate any latent fingerprints.  (T-II, 65).  Officer Martindale had examined hundreds of plastic baggies in narcotics cases and had never got fingerprints off of them.  (T-II, 67).

Ms. Rachel Topacio testified that she was a forensic chemist and worked in the Forensic Science Laboratory of the Oakland County Sheriff's Department.  The parties

stipulated to her expertise in the field of analysis of narcotics. (T-II, 73-74). The parties also stipulated that Ms. Topacio analyzed the substance found in the plastic bag in the shoe box in the Defendant's apartment and that it was 53 grams of marijuana. The parties stipulated that she analyzed the substance found in the sock in Defendant's apartment and that it was 93 grams of cocaine. (T-II, 73-74). The parties also stipulated that the Defendant was ineligible by law to possess a firearm. (T-II, 76). Following the testimony of Officer Martindale, the People rested.

The People brought a motion in limine to prevent the Defendant from calling two police officers as witnesses to testify that Mr. Andrew Warren had been recently arrested for possession with intent to deliver cocaine. Mr. Warren was one of the other males present in the Defendant's apartment on October 22, 2003, when the police arrived. The trial court granted the People's motion holding that the testimony of the officers in that regard would be improper character evidence. The trial court did not preclude the Defendant from calling Mr. Warren as a defense witness. (T-II, 76-79). Through his attorney, Mr. Warren indicated that if called as a witness, he would invoke his Fifth Amendment right to remain silent. (T of afternoon session of 10/21/04, hereafter T-III, 2-3).

The trial court denied the Defendant's motion for a directed verdict. (T-III, 10-11). The Defendant rested without calling any witnesses. (T-III, 16). Following closing arguments by the assistant prosecutor and counsel for the Defendant, the trial court instructed the jury concerning the applicable law. (T-III, 42-60). On October 22, 2004, the jury found the Defendant guilty as charged . . . .

Pl.-Appellee's Br. on App., in *People v. Hardy*, No. 259971 (Mich. Ct. App.), at 1-11.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

9

principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Fourth Amendment (Claim I)*

Petitioner first contends that the initial search of his apartment after the officers first entered, justified as a protective sweep of the apartment conducted for the safety of the officers, violated his Fourth Amendment right to be free from unreasonable searches and seizures.  Because this claim does not present a cognizable basis for habeas relief, the Court should conclude that petitioner is not entitled to relief on this claim.

Because "the exclusion of illegally seized evidence is simply a prophylactic device intended to deter Fourth Amendment violations by law enforcement officers," *Kaufman v. United States*, 394 U.S. 217, 224 (1969), the Supreme Court has determined that

> where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an

10

unconstitutional search or seizure was introduced at his trial.

*Stone v. Powell*, 428 U.S. 465, 482 (1976); *see also, Cardwell v. Taylor*, 461 U.S. 571, 571-72 (1983) (per curiam).  Thus, petitioner's claim is not cognizable on habeas review if he had an adequate opportunity to present his claim to the state courts.  "For such an opportunity to have existed, the state must have provided, in the abstract, a mechanism by which to raise the claim and the presentation of the claim in this case must not have been frustrated by a failure of that mechanism." *Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir. 1985); *see also, Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982); *Willett v. Lockhart*, 37 F.3d 1271-72 (8th Cir. 1994).  The requirement that there be, in the abstract, a mechanism by which to raise the Fourth Amendment claim "is met when state procedures provide a meaningful vehicle for a prisoner to raise a fourth amendment claim." *United States v. Scarborough*, 777 F.2d 175, 182 (4th Cir. 1985).

There is no question that Michigan provides such mechanism, in the abstract, to raise and litigate Fourth Amendment claims. *See Markham v. Smith*, 10 Fed. Appx. 323, 327 (6th Cir. 2001); *Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000).  Further, there is no question that petitioner was able to utilize that mechanism in his case.  Petitioner filed a motion to suppress in the trial court, and the trial court conducted an evidentiary hearing before denying petitioner's motion.  Petitioner also raised the claim on direct appeal, and the claim was considered and rejected by the Michigan Court of Appeals.  As the Seventh Circuit has succinctly described the *Stone* rule, "'full and fair' guarantees the right to present one's case, but it does not guarantee a correct result." *Cabrera v. Hinsley*, 324 F.3d 527, 532 (7th Cir. 2003).  Thus, the courts "have consistently held that an erroneous determination of a habeas petitioner's Fourth Amendment claim does not overcome the *Stone v. Powell* bar." *Gilmore v. Marks*, 799 F.2d 51, 57 (3d Cir. 1986); *see also, Willett*, 37 F.3d at 1270 (citing cases).  An argument directed solely at the correctness of the state court decision "goes not

11

to the fullness and fairness of his opportunity to litigate the claim[s], but to the correctness of the state court resolution, an issue which *Stone v. Powell* makes irrelevant." *Siripongs v. Calderon*, 35 F.3d 1308, 1321 (9th Cir. 1994). Because petitioner had a full and fair opportunity to litigate his Fourth Amendment claim, the claim is not cognizable on habeas review. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Right to Present a Defense (Claim II)*

Petitioner next contends that he was denied the right to present a defense by the trial court's exclusion of evidence that Andrew Warren, who was at the apartment at the time the officers entered, was later arrested on cocaine charges. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law. Implicit in these provisions is the right to present a meaningful defense. As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967). "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact. The right to offer testimony is thus grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408. Although the right to present a

12

defense is fundamental, it is not absolute.  Thus, the right must yield to other constitutional rights, *see*

*e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment

right of an accused to compulsory process to secure attendance of a witness does not include the

right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate

demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

To constitute a denial of the right to present a defense, a trial court's exclusion of evidence

must "infringe[] upon a weighty interest of the accused."  *United States v. Scheffer*, 523 U.S. 303, 308

(1998).  A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously

undermined 'fundamental elements of the defendant's defense' against the crime charged."  *Miskel*

*v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315).  Thus, "'[w]hether

the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon

whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt

that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting

*Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court).  In other

words, application of the rules of evidence constitute a denial of the right to present a defense only

where it "significantly undermine[s] fundamental elements of the accused's defense," *Scheffer*, 523

U.S. at 315–that is, where the application of the evidentiary rules "infringe[s] upon a weighty interest

of the accused."  *Scheffer*, 523 U.S. at 308.

2.    *Analysis*

During trial, the trial court granted the prosecutor's motion to prevent petitioner from calling

as witnesses two police officers who would testify that Andrew Warren had been arrested for

possessing with intent to distribute cocaine.  The court did not preclude petitioner from calling Warren

as a witness, but Warren informed the court, through counsel, that if called he would assert his Fifth

Amendment privilege against self-incrimination and refuse to testify.  Petitioner contends that the exclusion of the evidence of Warren's arrest deprived him of the right to present a defense because it precluded him from presenting evidence to the jury that Warren was the owner of the drugs found in his apartment.  The Michigan Court of Appeals rejected this claim, concluding that the evidence was impermissible "other acts" evidence under MICH. R. EVID. 404(b), and that the evidence was not admissible impeachment evidence because Warren did not testify at trial.  *See Hardy*, 2006 WL 1330223, at *2.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

As the Michigan Court of Appeals noted, evidence of Warren's arrest for possessing cocaine would have been inadmissible propensity evidence under Rule 404(b).  That rule provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material[.]"  MICH. R. EVID.404(b).  Here, petitioner proposed to present evidence of Warren's subsequent drug possession solely to show action in conformity therewith, *i.e.*, that Warren possessed the drugs found in petitioner's apartment.  As such, the evidence was impermissible propensity evidence barred by Rule 404(b).  *See People v. Catanzarite*, 211 Mich. App. 573, 580, 536 N.W.2d 570, 573 (1995).  This result is consistent with federal courts' interpretation of Rule 404(b) in analogous circumstances, *see, e.g.*, *United States v. Lucas*, 357 F.3d 599, 606 (6th Cir. 2004), and the exclusion of propensity evidence under Rule 404(b) does not generally implicate a defendant's right to present a defense.  *See Boggs v. Collins*, 226 F.3d 728, 744 (6th Cir. 2000).

Further, petitioner cannot show that the exclusion of Warren's arrest undermined a significant

14

aspect of his defense, because the evidence even if permissible as propensity evidence was only marginally relevant to whether petitioner possessed the drugs found in his apartment. Petitioner contends that, like his case, when Warren was arrested the police found cocaine in a kitchen drawer. As the court of appeals explained, however, there is nothing "unique and distinctive" about hiding drugs in a kitchen drawer. Further, there was significant other evidence that petitioner was involved in drug dealing. The apartment was indisputably his, and there was no evidence that Warren lived there. In addition to the cocaine found in the drawer, the police also found a digital scale and plastic baggies consistent with cocaine distribution, as well as marijuana in a box inside petitioner's closet. Evidence that Warren had hidden cocaine in his own kitchen drawer would not have altered the jury's conclusion that petitioner was involved in distributing drugs in light of this other evidence of drug dealing which implicated only petitioner. In these circumstances, petitioner cannot show that he was denied a fair trial by the exclusion under Rule 404(b) of evidence that Warren had been arrested for possessing cocaine. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Sufficiency of the Evidence (Claim III)*

Finally, petitioner contends that the prosecution presented insufficient evidence to support his drug convictions. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

2.    *Analysis*

Petitioner contends that the prosecution presented insufficient evidence to prove that he possessed the drugs or guns found in the apartment. The Michigan Court of Appeals rejected this claim, reasoning:

16

Here, it is reasonable to infer that defendant had the right to control the drugs because the police found cocaine in the same drawer as an electric bill and lease information addressed to defendant and they found marijuana in defendant's hall closet inside a shoebox.  Moreover, in the kitchen, the police also found items such as torn baggies and a digital scale that are typically used in drug operations.  Concerning the rifle, it is reasonable to infer that defendant knew about the rifle's location because the police found the rifle in plain view in defendant's bedroom where defendant also kept correspondence addressed to him.  Furthermore, defendant clearly had access to the rifle because police found defendant in the living room, only fifteen feet away from the bedroom.  Clearly, sufficient evidence supported defendant's conviction.

*Hardy*, 2006 WL 1330223, at *3.  The Court should conclude that this determination was reasonable.

Under Michigan law, a person need not have actual physical possession of a drug or firearm to be convicted of a possession offense.  Rather, it is sufficient that he have constructive possession, meaning the ability to exercise dominion and control over the drugs.  *See People v. Johnson*, 466 Mich. 491, 500, 647 N.W.2d 480, 486 (2002); *People v. Wolfe*, 440 Mich. 508, 519-20, 489 N.W.2d 748, 753 (1992).  In petitioner's case the evidence, when viewed in the light most favorable to the prosecution, was sufficient to establish petitioner's possession of the cocaine, marijuana, and rifle recovered in the apartment.  The undisputed evidence showed that the apartment belonged to petitioner, as evidenced by his lease of the apartment and the mail and bills addressed to him at that location.  The evidence also showed that the drugs and rifle were found in hidden locations inside the apartment, in places accessible to petitioner.  From this evidence, a reasonable juror could conclude beyond a reasonable doubt that petitioner had at least constructive possession of the drugs and rifle found in the apartment.  *See United States v. Richardson*, 208 F.3d 626, 632 (7th Cir. 2000); *United States v. Jenkins*, 175 F.3d 1208, 1216 (10th Cir. 1999); *United States v. McCracken*, 110 F.3d 535, 541 (8th Cir. 1997).

Petitioner nevertheless contends that the evidence was insufficient because he shared the apartment with Leonard, his girlfriend.  Because she equally lived in the apartment and had access

17

to the common areas where the drugs and rifle were recovered, petitioner argues, the evidence was insufficient to establish that he rather than Leonard possessed the drugs and rifle. The fact that the evidence may have supported another version of events is irrelevant; the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient. *See Jackson*, 443 U.S. at 326. Because of this, and because possession need not be exclusive, the fact that Leonard also had access to the apartment does not render the evidence insufficient to establish petitioner's possession beyond a reasonable doubt. *See United States v. Gibbs*, 182 F.3d 408, 425 (6th Cir. 1999); *cf. United States v. Patterson*, 295 Fed. Appx. 100, 101-02 (8th Cir. 2008). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.     *Conclusion*

       In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

       The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation*

18

*of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

      Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

      s/Paul J. Komives           
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 9/30/09

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on September 30, 2009.
>
>       s/Eddrey Butts     
> Case Manager